IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

MICHAEL K. ALLISON,            )
                               )
            Plaintiff,         )
                               )
    v.                         )   Case No. 06-03235-CV-S-REL-SSA
                               )
MICHAEL J. ASTRUE, Commissioner )
of Social Security,            )
                               )
            Defendant.         )


## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Michael Allison seeks review of the Commissioner of Social Security's final order denying his application for supplemental security income benefits under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 1381, et seq. Plaintiff argues that the Administrative Law Judge ("ALJ") erred (1) in disregarding his treating psychologist's findings when determining residual functional capacity, (2) in discounting his position that he was unable to work, and (3) by posing improper hypothetical questions to the vocational expert. I find that the ALJ (1) did not err in determining Plaintiff's residual functional capacity, (2) correctly discredited his position and (3) formulated proper hypothetical questions. As a result, Plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I. BACKGROUND

On July 31, 2001, Plaintiff filed an application for supplemental security income benefits as a child, alleging that he had been disabled since July 31, 2001 (Tr. at 83, 302). Plaintiff's alleged disability stemmed from attention deficit hyperactivity disorder ("ADHD"), bipolar affective disorder, oppositional defiant disorder, and borderline intellectual functioning (Tr. at 302). His claim

was allowed, with benefits beginning in July of 2001 (Tr. at 305). When Plaintiff turned eighteen on January 4, 2004, his disability status was reevaluated under the standard applicable to adults (Tr. at 14). Upon reevaluation, it was determined that Plaintiff was not disabled and was thus no longer eligible to receive benefits (Tr. at 14, 306). Plaintiff was denied benefits again upon reconsideration (Tr. at 314). On November 14, 2005, after a hearing, an ALJ also determined Plaintiff was no longer eligible to receive benefits (Tr. at 14-22). The Appeals Council of the Social Security Administration denied Plaintiff's request for review on April 13, 2006 (Tr. at 7-9). Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 1631(c)(3) of the Act, 42 U.S.C. § 1383(c)(3), provides for judicial review of a "final decision" of the Commissioner under Title XVI. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence as provided by 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3); see also Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Johnson, 108 F.3d at 179. "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987)(citing Steadman v. Sec. & Exch. Comm'n, 450 U.S. 91, 99 (1981)).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S.

at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n.5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Jernigan, 948 F.2d at 1073 n.5 (quoting Baker v. Heckler, 730 F.2d 1147, 1150-51 (8th Cir. 1984)).

### III.  BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming supplemental security income benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(A).  If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform.  See Wilcutts v. Apfel, 143 F.3d 1134, 1137 (8th Cir. 1998).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 416.1920 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

        Yes = not disabled.
        No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

3

No = not disabled.
Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

Yes = disabled.
No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

No = not disabled.
Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

Yes = disabled.
No = not disabled.

## IV.  THE RECORD

The record consists of the testimony of Plaintiff's mother Terri Allison, Plaintiff, and vocational expert George Horne; documentary evidence was also admitted at the hearing.  I note that the record contains a large amount of evidence concerning Plaintiff's condition, dating back into the 1990s.  For purposes of this review, only evidence relevant to the instant determination will be discussed.

### *A.  ADMINISTRATIVE RECORDS*

### 1.      Individualized Education Program

A January 16, 2003, individual education program report stated Plaintiff had a learning disability in the area of math calculation (Tr. at 395).  When asked to describe his present level of performance, Plaintiff stated:

I am a seventeen-year-old junior enrolled at Central High School.  I attend a community-based program at SMSU to learn job skills.  I live with both parents, two sisters, and two brothers.  I have an older brother that is in the U.S. Navy.

4

I am in good health. I try to eat a healthy diet. I get my exercise at the YMCA, and at work. I am able to do all the work that is required on the job. I have been diagnosed with ADD and ADHD, and this makes it hard for me to focus sometimes.

My hearing is fine. I wear glasses for astigmatism and nearsightedness. I stutter now and then, but I have no major speech or language problems.

My test scores show that I am in the low-average range of intellectual ability. I enjoy activities where I can work with my hands.

I think that I am a lot like other seventeen-year-olds. I've got my driver's permit, but I haven't practiced driving yet. At home I vacuum, take care of the pets, and do laundry now and then. I can cook a few things. I really enjoy watching the History channel.

I can read fairly well, and understand what I read. Sometimes I don't know the meanings of new words. I have trouble thinking of things to write, but my handwriting is very neat. I am a slow worker sometimes because I like my work to look nice. I enjoy doing writing assignments on the computer. I would like to learn to count back change in case I ever need that for a job. I need to keep working on filling out forms and writing a resume. I want to work on improving my basic math skills.

I am not sure what I want to do after graduation. I enjoyed my jobs at catering, photography, and the custodial department. I did not like working at grounds. I hope to get a paying job soon. I have put an application in at Domino's Pizza.

I have been diagnosed with bipolar disorder and manic depression. I am taking Depa[k]ote. I used to have some trouble with behavior at school, but I don't have problems with that anymore.

(Tr. at 396). Plaintiff's teacher added:

Michael is doing a good job at BASE this year. His supervisors have great things to say about his job performance. He needs to continue exploring post-graduation options and working to build daily living skills and basic academics. He has improved since last year on his reading, but still says that he wants to continue working on basic skills, especially in math.

(Tr. at 396).

Plaintiff was not rated as exhibiting behaviors that impeded his learning or that of others (Tr. at 397). He was not able to fully participate in regular education due to (1) disruptions/distractions in the regular classroom interfering with achievement, (2) the amount of individual attention required

5

disrupts teachers' ability to provide quality instruction to others, (3) Plaintiff's diverse learning styles require an alternative instructional environment, (4) increased regular classroom participation would increase Plaintiff's frustration, and (5) Plaintiff's need for highly structured, small-group settings and individual instruction (Tr. at 399). Plaintiff was outside the regular classroom for more than sixty percent of the time (Tr. at 399).

A January 14, 2004, individual education program report stated Plaintiff had a learning disability in the area of math calculation (Tr. at 380). When asked to describe his present level of performance, Plaintiff stated:

> I am an eighteen-year-old senior enrolled at Central High School. I attend a community-based program at SMSU to learn job skills. I live with both parents, two sisters, and two brothers. I have an older brother that is in the U.S. Navy.
>
> I am in good health. I try to eat a healthy diet. I get my exercise at the YMCA, and at work. I am able to do all the work that is required on the job. I have been diagnosed with ADD and ADHD, and this makes it hard for me to focus sometimes.
>
> My hearing is fine. I wear glasses for astigmatism and nearsightedness. I stutter now and then, but I have no major speech or language problems.
>
> My test scores show that I am in the low-average range of intellectual ability. I enjoy activities where I can work with my hands.
>
> I think that I am a lot like other eighteen-year-olds. I've got my driver's permit, but I am not ready to take the driving part of the test yet. At home I vacuum, take care of the pets, and do laundry now and then. I can cook a few things. I really enjoy watching the History Channel and playing my PS2.
>
> I can read fairly well, and understand what I read. Sometimes I don't know the meanings of new words. I have trouble thinking of things to write, but my handwriting is very neat. I am a slow worker sometimes because I like my work to look nice. I enjoy doing writing assignments on the computer. I have completed a checking account unit, and have been working some on counting back change. I need to keep working on filling out forms and writing a resume. I want to work on improving my basic math skills.
>
> I am not sure what I want to do after graduation. I enjoyed my jobs at catering, photography, and the custodial department. I did not like working at grounds. I was recently hired as a dishwasher at Sodexho-Marriot, from 4:00 to 8:15, five days per week.
>
> I have been diagnosed with bipolar disorder and manic depression. I am

6

taking Depa[k]ote.

(Tr. at 381). Plaintiff's teacher added:

> Michael is doing a good job at BASE this year. His supervisors have great things to say about his job performance. He needs to continue exploring post-graduation options and working to build daily living skills and basic academics. He has improved since last year on his reading, but still says that he wants to continue working on basic skills, especially in math.

(Tr. at 381).

Plaintiff was not rated as exhibiting behaviors that impedes his learning or that of others (Tr. at 382). He was not able to fully participate in regular education due to (1) disruptions/distractions in the regular classroom interfering with achievement, (2) the amount of individual attention required disrupts teachers' ability to provide quality instruction to others, (3) Plaintiff's diverse learning styles require an alternative instructional environment, (4) increased regular classroom participation would increase Plaintiff's frustration, and (5) Plaintiff's need for highly structured, small-group settings and individual instruction (Tr. at 384). Plaintiff was outside the regular classroom for more than sixty percent of the time (Tr. at 384).

## 2.     Report of Contact

On January 6, 2004, Kim Nye, Plaintiff's BASE Program teacher, stated Plaintiff enrolled in the program to learn work and life skills (Tr. at 366). He did well, especially in the janitorial area (Tr. at 366). Ms. Nye described Plaintiff as being fairly easy to get along with and stated he handled criticism fairly well without getting too upset (Tr. at 366). She reported infrequent episodes where Plaintiff did not want to participate and was in somewhat of a bad mood; overall, however, he was easy to get along with (Tr. at 366).

7

On March 30, 2004, Plaintiff's supervisor in the BASE Program's custodial department stated Plaintiff had recently been hired as a part-time, paid employee (Tr. at 429). He described Plaintiff as "immature and somewhat moody. When he displays moodiness he may work slower and seem preoccupied. Sometimes he may 'goof around' with other workers (students) such as horsing around, wrestling, or spraying each other with cleaners." (Tr. at 429). He further stated he has had "no problem with [Plaintiff's] attendance if he is at school he is at work also." (Tr. at 429). If Plaintiff was given extra work, he might have needed to be reminded to complete the tasks, but did well with his usual work tasks (Tr. at 429). Plaintiff did not have any problem with simple repetitive tasks (Tr. at 429).

When contacted again on April 7, 2004, Plaintiff's supervisor stated he believed Plaintiff could work forty hours a week "with a little patience" (Tr. at 430). The need for patience related to Plaintiff's occasional immature behavior and need for occasional reminders if given out-of-the-ordinary tasks (Tr. at 430).

**3.      Claimant Questionnaire**

Plaintiff's mother filled out a claimant questionnaire on January 8, 2004 (Tr. at 367-372). In the questionnaire, she reported Plaintiff had difficulty concentrating and said mood swings made it hard to deal with him when he was "in a out of control mood" (Tr. at 367). She also reported Plaintiff's depressed mood and tiredness prevented him from working (Tr. at 367). Anything that required concentration caused Plaintiff to have mood swings (Tr. at 367).

Mrs. Allison reported Plaintiff cared for his family's cats and changed the litter box (Tr. at 368). He had taken a checkbook unit at school but still needed help; it was hard for him to count change (Tr. at 368). She also described writing as difficult for Plaintiff because "it has to be perfect"

8

(Tr. at 368). Plaintiff was able to make a bed/change the sheets with help, vacuum, take out the trash, and mow the lawn with supervision (Tr. at 369).

Mrs. Allison shops for Plaintiff, as he got distracted and wanted to buy everything (Tr. at 369). He is able to make sandwiches and chocolate milk (Tr. at 369). Plaintiff's hobbies included video games, catching a football and going to church (Tr. at 370). An average day includes showering and getting dressed, going to school, coming home and playing video games, eating, and going to bed (Tr. at 370). Plaintiff could watch a thirty-minute television show, but had difficulty watching an hour-long show because it was hard to sit for that long and remember what was happening (Tr. at 370). He read the newspaper, but had trouble concentrating and remembering what he had read (Tr. at 370).

When asked about his ability to follow written and verbal instructions, Plaintiff's mother responded that he had to reread or have someone repeat directions (Tr. at 371). He typically left out a step or did not follow directions due to lack of understanding (Tr. at 371). Plaintiff required reminders to complete chores, did not always understand what was asked, forgot directions, or left out steps (Tr. at 371). Plaintiff had problems getting along with others and his mother said others had a hard time getting along with him because "when he is an outburst mood he will cuss, hit people, break things, and refuse to do [things]; when he's [in a] depressed mood he'll sleep" (Tr. at 371).

### 4. Grade Reports

During Plaintiff's junior year of high school, his first semester GPA was 3.250; his GPA second semester was 3.75, for a cumulative GPA of 2.7609 (Tr. at 373-374, 377-378). He received a 3.75 GPA his first semester of his senior year, elevating his cumulative GPA to 2.9074 (Tr. at 374).

9

### 5. Teacher Questionnaire

On January 24, 2004, Plaintiff's BASE Program instructor, Kim Nye, reported Plaintiff having "an obvious problem" in the following areas: (1) comprehending oral instructions; (2) understanding school and content vocabulary; (3) reading and comprehending written material; (4) understanding and participating in class discussions; (5) learning new material; and (6) recalling and applying previously learned material (Tr. at 413). He had "a serious problem" (1) comprehending and doing math problems, (2) providing organized oral explanations and adequate descriptions, (3) expressing ideas in written form, and (4) applying problem-solving skills in class discussions (Tr. at 413). Ms. Nye further stated, "Michael is slow to process information. He usually requires a second explanation, one-on-one, so that he can proceed with independent work. His inability to focus, and lack of motivation for academic work, contribute to the problem" (Tr. at 413).

Plaintiff did not have a problem carrying out single-step instructions, waiting to take turns, or completing work accurately without careless mistakes (Tr. at 414). He had "a slight problem" (1) paying attention when spoken to directly, (2) sustaining attention during play/sports activities, (3) focusing long enough to finish assigned activities or tasks, (4) refocusing to task when necessary, and (5) changing from one activity to another without being disruptive (Tr. at 414). Ms. Nye rated Plaintiff as having "an obvious problem" carrying out multi-step instructions, organizing his own things or school materials, and completing class/homework assignments (Tr. at 414). He had "a serious problem" working without distracting himself or others and "a very serious problem" working at a reasonable pace and/or finishing on time (Tr. at 414).

With regard to interacting and relating with others, Ms. Nye rated Plaintiff as having "no problem" with: (1) playing cooperatively with other children; (2) making and keeping friends; (3)

asking permission appropriately; (4) respecting/obeying adults in authority; (5) relating experiences and telling stories; (6) using language appropriate to the situation and listener; and (7) using adequate vocabulary and grammar to express thoughts/ideas in general, everyday conversation (Tr. at 415). He had "a slight problem" seeking attention appropriately, expressing anger appropriately, following rules, introducing and maintaining relevant and appropriate topics of conversation, and taking turns in conversation (Tr. at 415). Plaintiff had "an obvious problem" interpreting the meaning of facial expressions, body language, hints and sarcasm (Tr. at 415). Ms. Nye stated, "About every six weeks or so (cyclical), [Plaintiff] simply becomes stubborn and will refuse to behave cooperatively. This could be due to his bipolar disorder." (Tr. at 415). It had not been necessary to implement behavior modification strategies (Tr. at 415).

Finally, with regard to caring for himself, Ms. Nye reported Plaintiff did not have a problem taking care of personal hygiene, caring for physical needs, or knowing when to ask for help (Tr. at 417). He experienced "a slight problem" with handling frustration appropriately, being patient when necessary, cooperating in or being responsible for taking needed medications, using good judgment regarding personal safety and dangerous circumstances, responding appropriately to changes in his mood, and using appropriate coping skills to meet the daily demands of the school environment (Tr. at 417). Plaintiff had "an obvious problem" identifying and appropriately asserting emotional needs (Tr. at 417). Ms. Nye noted, "[Plaintiff's] mood will change suddenly based on whether or not his girlfriend pays attention to him or not. He is very immature in some ways and ties his emotions to external controls, rather than realizing he has power to make choices." (Tr. at 417). She also stated "[Plaintiff] is a nice person that is just a bit slow when processing auditory information. He is physically fit, and could probably do well on the job, if the right match is found. He follows

directions well when he understands what he's being asked to do."  (Tr. at 419).

On May 26, 2004, Ms. Nye completed another teacher questionnaire (Tr. at 452-459). She categorized Plaintiff as having "a slight problem" comprehending oral instructions and understanding and participating in class discussions (Tr. at 453).  He had "an obvious problem" (1) reading and comprehending written material, (2) providing organized oral explanations and adequate descriptions, (3) learning new material, and (4) recalling and applying previously learned material - although he was good at history (Tr. at 453).  Plaintiff had "a serious problem" understanding school and content vocabulary, comprehending and doing math problems and applying problem-solving skills in class discussions (Tr. at 453).  He had "a very serious problem" expressing ideas in written form (Tr. at 453).  Ms. Nye added, "Michael tries to be meticulous with his handwriting.  His sentences are short and he probably could not write a complete paragraph without some assistance." (Tr. at 453).

With regard to attending and completing tasks, Ms. Nye reported Plaintiff had "no problem" with sustaining attention during play/sports activities, waiting to take his turn, changing from one activity to another without being disruptive, organizing his own things or school materials, and working without distracting himself or others (Tr. at 454).  He had "a slight problem" paying attention when spoken to directly, refocusing to task when necessary and carrying out single-step instructions (Tr. at 454).  Plaintiff had "an obvious problem" focusing long enough to finish an assigned activity or task, carrying out multi-step instructions, completing class/homework assignments, and with completing work accurately (Tr. at 454).  Finally, he had "a serious problem" with working at a reasonable pace (Tr. at 454).

When asked about Plaintiff's ability to interact and related with others, Ms. Nye rated

Plaintiff as having "no problem" with: (1) playing cooperatively with other children; (2) making and keeping friends; (3) asking permission appropriately; (4) respecting/obeying adults in authority; (5) using language appropriate to the situation and listener; and (6) taking turns in conversation (Tr. at 455). He had "a slight problem" seeking attention appropriately, following rules, and using adequate vocabulary and grammar to express thoughts/ideas in general, everyday conversation (Tr. at 455). Plaintiff had "an obvious problem" (1) relating experiences and telling stories, (2) introducing and maintaining relevant an appropriate topics of conversation, and (3) interpreting the meaning of facial expressions, body language, hints and sarcasm (Tr. at 455). He had "a serious problem" expressing anger appropriately (Tr. at 455).

Concerning Plaintiff's ability to care for himself, Ms. Nye reported "no problem" (1) handling frustration appropriately, (2) being patient when necessary, (3) taking care of personal hygiene, (4) caring for physical needs, (5) cooperating in, or being responsible for, taking needed medications, (6) using good judgment regarding personal safety and dangerous circumstances, and (7) knowing when to ask for help (Tr. at 457). She described Plaintiff as having "an obvious problem" with identifying and appropriately asserting emotional needs and using appropriate coping skills to meet the daily demands of a school environment, and "a serious problem" responding appropriately to changes in his own mood (Tr. at 457).

Lastly, Ms. Nye noted, "[Plaintiff] is a nice young man 90% of the time. He is below grade level compared to peers and gets frustrated with academic work. He holds down a part-time job, but is definitely a follower, not a leader. Twice, during the 2 ½ years I've taught [Plaintiff] he's gotten 'out-of-control' and refused to cooperate. His parents report these types of problems with more frequency." (Tr. at 459).

13

**6.      Disability Report**

Plaintiff's April 21, 2004, Disability Report stated he had difficulty working with large groups of people and was unable to do stressful jobs (Tr. at 444, 447).  Jobs with more than one step aggravated Plaintiff's symptoms (Tr. at 447).  He reported getting written up at his job at the Marriott and quitting (Tr. at 444).  At home, Plaintiff walked the dogs, made his bed/changed the sheets, and mowed the lawn; he was unable to do laundry, do the dishes, iron, vacuum, take out the trash, rake leaves, garden, bank, or go to the post office (Tr. at 448, 449).  He was also unable to pay bills, use a checkbook and complete a money order, as he was not good with math (Tr. at 448).  He needed to be reminded to finish tasks that required more than one step (Tr. at 451).

Plaintiff's hobbies included video games and football (Tr. at 450).  An average day consisted of showering, getting dressed, eating, going to school and/or work, coming home and eating, playing football or video games, and going to bed (Tr. at 450).  Plaintiff could watch a thirty-minute television program, but had trouble watching an hour-long show since it was hard for him to sit still and understand the plot (Tr. at 450).  He reads magazines but has difficulty understanding and remembering what he has read (Tr. at 450).

Finally, Plaintiff reported problems getting along with other people (Tr. at 451).  People also had a hard time getting along with him because he gets mad and "starts cussing" and throwing things; he also stated he hits and fights with others (Tr. at 451).

**7.      Background Questionnaire**

On May 12, 2005, Plaintiff reported working at a job where he swept floors and emptied trash cans (Tr. at 471).  He was able to mow the grass, make sandwiches and vacuum at home  (Tr. at 471).

14

## B. SUMMARY OF MEDICAL RECORDS

On December 2, 2002, Dr. Steven Larsen completed written interrogatories regarding whether Plaintiff suffered from a childhood disability (Tr. at 188-194). He stated Plaintiff had attention deficit hyperactivity disorder, bipolar disorder, oppositional deficit disorder, borderline intelligence, and a learning disability in math (Tr. at 189). Dr. Larsen opined that Plaintiff's impairments met Listings 112-11, ADHD, and Listing 112-04, Mood Disorder (Tr. at 189).

Plaintiff saw Arie Ashkenasi, M.D., on March 3, 2003 (Tr. at 482). Plaintiff had been diagnosed recently with bipolar disorder - unspecified rapid cycling,[1] as well as with ADHD-combined type and borderline intellectual functioning (Tr. at 482). Current medications included Depakote[2] 500 mg twice daily, Celexa[3] 20 mg in the morning, and Nortriptyline[4] 25 mg at bedtime (Tr. at 482). Plaintiff had an episode a few weeks ago when he became aggressive and violent, went into his home, closed the door and threatened to hit and kill everyone (Tr. at 482). The police became involved and Plaintiff eventually opened the door; he then had no recollection of what happened (Tr. at 482). Dr. Ashkenasi increased Plaintiff's prescription of Depakote to 625 mg twice daily (Tr. at 482). Because the Celexa made Plaintiff tired, Dr. Ashkenasi planned to gradually take

---

[1] The fourth edition of the Diagnostic and Statistical Manual of Mental Disorders defines "rapid cycling bipolar disorder" as a type of bipolar disorder in which an individual experiences four or more mood swings or episodes in a twelve-month period.

[2] Depakote "affects chemicals in the brain that may be related to seizures, migraine headaches, and manic episodes in bipolar disorder." Yahoo!Health, Drug Guide, at http://health.yahoo.com/drug/d03833a1_ylt= Au3qGQplqXEPKgPdS8e1wLYkD7sF (last visited Mar. 29, 2007).

[3] Celexa is "used to treat depression." Yahoo!Health, Drug Guide, at http://health.yahoo.com/drug/d04332a1;_ ylt=AmOuv0Zuwtmakh_RY79LrNckD7sF (last visited Mar. 29, 2007).

[4] Nortriptyline is "used to relieve symptoms of depression." Yahoo!Health, Drug Guide, at http://health. yahoo.com/drug/d00144a1;_ylt=AkLXnZ2B50l5G6MzSESndrMkD7sF (last visited Mar. 29, 2007).

15

him off the drug (Tr. at 482).

On June 30, 2003, Plaintiff saw Dr. Ashkenasi for a routine check-up (Tr. at 480). Plaintiff was doing very well on Depakote ER 2000 mg and Nortriptyline 25 (Tr. at 480). He made straight A's at school (Tr. at 480). Plaintiff's mother was pleased and he seemed to be happy (Tr. at 480). Plaintiff was instructed to resume follow-up with a psychologist for close supervision (Tr. at 480).

Plaintiff saw Dr. Ashkenasi on December 29, 2003 (Tr. at 479). Plaintiff had bipolar disorder, borderline intellectual functioning, and ADHD-combined type (Tr. at 479). Dr. Ashkenasi noted he was doing very well on Depakote ER 2000 mg; with the 25 mg of Nortriptyline, Plaintiff did not have headaches (Tr. at 479). He was continued on the same medications and referred to an adult psychiatrist for continuation of his follow-up (Tr. at 479).

Licensed psychologist, Amber Fain-Leslie, Ph.D., completed a clinical assessment of Plaintiff on January 19, 2004 (Tr. at 546-548, 612-614). Plaintiff's mother reported he seemed "to have stabilized" (Tr. at 546, 612). She further stated Plaintiff experienced a depressed mood once or twice a week that lasted anywhere from one hour to a whole day (Tr. at 546, 612). Every four to six weeks, he experienced "out-of-control" behavior, including cursing and refusing to comply with requests (Tr. at 546, 547, 612, 613). Plaintiff reportedly became irritable if there were noises when he was trying to concentrate (Tr. at 546, 612). He had "a lot" of friends and also had a girlfriend (Tr. at 546, 612). Plaintiff denied current stressors, other than being asked about his plans after graduation (Tr. at 547, 613). Dr. Fain-Leslie noted Plaintiff's mood was neutral and appropriate to the situation, his affect was neutral and congruent with the topic, his thought process and perception were within normal limits, and his judgment appeared fair (Tr. at 547, 613). His insight into his illness appeared

fair to poor (Tr. at 547, 613).  Plaintiff was diagnosed with disruptive behavior disorder, dysthymia[5]

by report, mood disorder by report, and mild mental retardation by report; his GAF was 60[6] (Tr. at

547, 613).

On February 24, 2004, Mildred Baluyot, M.D., performed a psychiatric evaluation on

Plaintiff (Tr. at 542-545, 608-611).  Plaintiff stated his "behavior problems" were not as bad as

before (Tr. at 542, 608).  He reported feeling tired and having low energy; he denied problems with

sleep or appetite (Tr. at 542, 608).  Plaintiff said he was doing better academically and his grades had

improved a lot (Tr. at 542, 608).  Current medications included Depakote 2000 mg and Nortriptyline

25 mg (Tr. at 543, 609).  During the mental status exam, Plaintiff reported occasional irritability,

especially when it was too noisy and he was unable to concentrate (Tr. at 544, 610).  He stated his

mood was euthymic except for last night when he had a fight with his girlfriend (Tr. at 544, 610).

Dr. Baluyot noted Plaintiff's speech and fund of knowledge appeared to be consistent with borderline

intellectual functioning (Tr. at 544, 610).  She stated Plaintiff could perform activities of daily living

on his own (Tr. at 544, 610).  His GAF was 65[7] (Tr. at 544, 610).  Plaintiff's medications were

continued at the current levels; however, Dr. Baluyot would consider increasing his Nortriptyline

---

[5]Dysthymia is a "chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some of the following symptoms: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness." STEDMAN'S MEDICAL DICTIONARY 536 (26th ed. 1995).

[6]The GAF is a 100-point tool rating overall psychological, social and occupational functioning of people 18 years of age and older.  It excludes physical and environmental impairments.  A score ranging from 61 to 70 indicates mild symptoms in one area or "difficulty in one of the following: social, occupational, or school functioning.  BUT, the person is generally functioning pretty well and has some meaningful personal relationships."  Barbara L. Brown, *Global Assessment of Functioning (GAF) Scale (DSM - IV Axis V)*, *at* http://www.gpc.edu/~bbrown/psyc2621/ch3/gaf.htm (last visited Mar. 29, 2007).

[7]A GAF score ranging from 51to 60 indicates moderate symptoms or "moderate difficulty in one of the following: social, occupational, or school functioning."  Id.

17

dosage if he continued to exhibit depressive symptomatology (Tr. at 544-545, 610-611).

On March 23, 2004, Plaintiff Dr. Baluyot again (Tr. at 540, 622). He reported having two part-time jobs that he liked (Tr. at 540, 622). Plaintiff had been eating and sleeping well, was stable in mood and taking his medications (Tr. at 540, 622). During the appointment, Plaintiff maintained good eye contact (Tr. at 540, 622). He denied stressors at work or at school (Tr. at 540, 622). He had not had any anger outbursts and seemed satisfied with his jobs and the independence the money gave him (Tr. at 540, 622). Plaintiff's medication regimen was not changed (Tr. at 540, 622).

Kenneth Burstin, Ph.D., completed a psychiatric review on April 8, 2004, for the period ranging from January 4, 2004, to the date of the report (Tr. at 552-566). Dr. Burstin stated Plaintiff had moderate limitations with his activities of daily living, maintaining social functioning, and maintaining concentration, persistence and pace (Tr. at 562). He disagreed with Dr. Fain-Leslie's January 19, 2004, diagnosis of disruptive behavior and possible mental retardation (Tr. at 564). Dr. Burstin referenced Plaintiff's BASE Program supervisor's March 30, 2004, and April 7, 2004, contact reports and, accordingly, opined Plaintiff's impairments were not disabling and that he was capable of performing unskilled tasks in setting that did not require very close interaction (Tr. at 564).

Dr. Burstin also completed a Mental Residual Functional Capacity Assessment on April 8, 2004 (Tr. at 566-569). He found Plaintiff to be markedly limited in the ability to understand and remember detailed instructions and carry out detailed instructions (Tr. at 566). Plaintiff was moderately limited in the ability to interact appropriately with the general public, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness (Tr. at 567). Lastly,

he found Plaintiff was not significantly limited in the ability to: (1) remember locations and work-like procedures; (2) understand and remember very short and simple instructions; (3) carry out very short and simple instructions; (4) maintain attention and concentration for extended periods; (5) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (6) sustain an ordinary routine without special supervision; (7) work in coordination with or proximity to others without being distracted by them; (8) make simple work-related decisions; (9) complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; (10) ask simple questions or request assistance; (11) accept instructions and respond appropriately to criticism from supervisors; (12) respond appropriately to changes in the work setting; (13) be aware of normal hazards and take appropriate precautions; (14) travel in unfamiliar places; and (15) set realistic goals or make plans independently of others (Tr. at 566-567). Dr. Burstin elaborated,

> The [Plaintiff] retains the capacity to acquire and retain at least simple instructions, and to sustain concentration an persistence with simple, repetitive tasks. The [Plaintiff] can relate adequately to others in settings which do not require frequent public contact or very close interaction with co-workers, and can adapt to changes in non-complex work environments.

(Tr. at 568).

On May 20, 2004, Plaintiff saw Dr. Baluyot (Tr. at 538, 621). Plaintiff looked happy and content (Tr. at 538, 621). He denied problems with anger or seizures and was continued on Depakote ER 2000 mg and Nortriptyline 25 mg (Tr. at 538, 621).

On June 28, 2004, G.W. Sutton, Ph.D., completed a psychiatric review of Plaintiff for the period from January 4, 2006, until June 28, 2004 (Tr. at 575-588). Dr. Sutton stated there was

Case 6:06-cv-03235-REL   Document 16   Filed 04/03/07   Page 19 of 36

evidence from Plaintiff's school testing that his academic skills were below normal; although ADHD was alleged, tests did not indicate significant problems when Plaintiff was off his medication (Tr. at 576). He opined Plaintiff had mild limitations in his activities of daily living and with maintaining social functioning, and moderate difficulties in maintaining concentration, persistence and pace (Tr. at 585). Dr. Sutton noted:

> The [plaintiff] has a medically determined impairment that is likely more than not severe. The [plaintiff] may have difficulty with some, but not all, complex tasks. There is no evidence of marked impact on social [function] or risk of decompensation. Overall it seems the [plaintiff] has residual skills needed to complete a workweek. Whatever mood disorder he may have appears controlled with meds and his cognitive [function] should allow for simple to moderately complex work.

(Tr. at 587).

Dr. Sutton also completed an Advisory Mental Residual Functional Capacity Assessment that same date (Tr. at 589-592). He found Plaintiff to be markedly limited in his ability to carry out detailed instructions (Tr. at 589). Plaintiff was moderately limited in his ability to understand and remember detailed instructions and set realistic goals or make plans independently from others (Tr. at 590). He was not significantly limited in his ability to (1) remember locations and work-like procedures; (2) understand and remember very short and simple instructions; (3) carry out very short and simple instructions; (4) maintain attention and concentration for extended periods; (5) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (6) sustain an ordinary routine without special supervision; (7) work in coordination with or proximity to others without being distracted; (8) make simple work-related decisions; (9) complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest

20

periods; (10) interact appropriately with the general public; (11) ask simple questions or request assistance; (12) accept instructions and respond appropriately to criticism from supervisors; (13) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (14) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; (15) respond appropriately to changes in the work setting; (16) be aware of normal hazards and take appropriate precautions; and (17) travel in unfamiliar places (Tr. at 589-590). Dr. Sutton added,

> The [plaintiff] appears able to understand, remember and carry out simple and some moderately complex instructions. The [plaintiff] appears to have no significant difficulties with social interaction. The [plaintiff] appears to have no additional problems adapting to simple to moderately complex work settings other than those mentioned above.

(Tr. at 591).

Plaintiff had an appointment with Dr. Baluyot on July 15, 2004 (Tr. at 620). He reported feeling down over the breakup with his girlfriend about a week ago (Tr. at 620). According to Plaintiff's mother, he had been quiet but had not lost his temper (Tr. at 620). The family had also been stressed by a recent robbery (Tr. at 620). Dr. Baluyot described Plaintiff as having downcast eyes and appearing sad (Tr. at 620). Plaintiff's mother talked for him since he refused to open up (Tr. at 620). Dr. Baluyot increased Plaintiff's dosage of Nortriptyline to 50 mg and continued his current dosage of Depakote (Tr. at 620).

On September 1, 2004, Plaintiff saw Dr. Baluyot (Tr. at 619). His mother reported he had been doing well and had gotten over his girlfriend, but was having small mood swings (Tr. at 619). Dr. Baluyot noted Plaintiff's mood was better and that he smiled and spoke coherently, although he did depend on his mother (Tr. at 619). Plaintiff's dosage of Nortriptyline was decreased from 50 mg; his Depakote dosage was 1750 mg (Tr. at 619).

On November 11, 2004, Plaintiff reported doing well but stated he was still having abdominal discomfort (Tr. at 618). He smiled and was quiet, letting his mother speak for him (Tr. at 618). Dr. Baluyot instructed Plaintiff he could increase his dosage of Depakote back to 2000 mg (Tr. at 618).

Plaintiff saw Dr. Baluyot on January 10, 2005 (Tr. at 617). He reported taking 1750 mg of Depakote a day rather than the prescribed 2000 mg because it did not cause abdominal pain at the lower dosage (Tr. at 617). Dr. Baluyot noted Plaintiff's mother did most of the talking for him (Tr. at 617). He was able to smile regarding his recent birthday (Tr. at 617). Plaintiff was continued on Depakote ER 1750 mg and Nortriptyline 25 mg (Tr. at 617).

On March 10, 2005, Plaintiff saw Dr. Baluyot (Tr. at 616). Plaintiff had been working less hours because his boss decided to reduce his work load (Tr. at 616). His boss also questioned his need for treatment with Dr. Baluyot (Tr. at 616). Plaintiff was in a stable mood, smiling and yawning at times (Tr. at 616). He was continued on Depakote ER 1750 mg and Nortriptyline 25 mg (Tr. at 616).

Plaintiff was seen by Dr. Baluyot on April 21, 2005 (Tr. at 516). She noted Plaintiff had been doing well and was in a stable mood (Tr. at 615). He had been getting along with his family and planned to go to a church retreat (Tr. at 615). Plaintiff's medications were refilled (Tr. at 615).

On June 17, 2005, Dr. Baluyot completed a Medical Source Statement - Mental (Tr. at 605-607). Dr. Baluyot found Plaintiff to be markedly limited in the ability to (1) understand and remember detailed instructions, (2) carry out detailed instructions, (3) maintain attention and concentration for extended periods, (4) work in coordination with or proximity to others without being distracted by them, (5) complete a normal workday and workweek without interruptions from

22

psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, (6) ask simple questions or request assistance, (7) accept instructions and respond appropriately to criticism from supervisors, (8) get along with coworkers or peers without distracting them or exhibiting behavioral extremes, (9) respond appropriately to changes in the work setting, (10) travel in unfamiliar places, and (11) set realistic goals or make plans independently of others (Tr. at 605-607). He was moderately limited in the ability to (1) remember locations and work-like procedures, (2) understand and remember very short and simple instructions, (3) carry out very short and simple instructions, (4) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, (5) sustain an ordinary routine without special supervision, (6) make simple work-related decisions, (7) interact appropriately with the general public, (8) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, and (9) set realistic goals or make plans independently of others (Tr. at 605-607). Dr. Baluyot opined Plaintiff could probably perform work on a part-time basis with supervision (Tr. at 607).

### C. SUMMARY OF TESTIMONY

During the hearing, Plaintiff's mother, Terri Allison, and Plaintiff both testified; vocational expert George Horne also testified at the request of the ALJ.

### 1. Plaintiff's mother's testimony

Plaintiff's mother, Terri Allison, testified that Plaintiff had been in special education programs from elementary school to the time he graduated from high school (Tr. at 49). Plaintiff's employment history includes working for Sedexho Marriott, doing janitorial work at SMSU, and working at the Bass Pro Shop (Tr. at 49-50). He quit working at SMSU due to frustration with his

Case 6:06-cv-03235-REL   Document 16   Filed 04/03/07   Page 23 of 36

inability to cope with demands; Bass Pro fired Plaintiff in July of 2005 because he could not perform the job (Tr. at 50).

Mrs. Allison further testified that Plaintiff was able to do chores around the house while under her supervision (Tr. at 51). Plaintiff requires constant one-on-one supervision when doing any type of work (Tr. at 51). At the time of the hearing, he had just been accepted for vocational rehabilitation (Tr. at 51-52). Plaintiff also started attending the Burrell Behavioral Health in January of 2004, and saw Dr. Baluyot every four to six weeks (Tr. at 52-53).

Plaintiff was currently collecting unemployment (Tr. at 55). In order to continue doing so, he was required to look for a job (Tr. at 55). Plaintiff met with a counselor to develop an individual employment plan (Tr. at 55).

## 2. Plaintiff's testimony

Plaintiff testified he had an application pending for a full-time position with a cleaning team (Tr. at 57). He took the bus to his interview and independently made multiple transfers without any difficulty (Tr. at 57-58). When Plaintiff was working and going to school, he did not have problems getting to work on time (Tr. at 59).

Plaintiff further testified he attended church on Wednesday nights (Tr. at 59). He also attended "variable access" at Missouri State University where they sing songs and "hang out"; afterward, he spends time with his friends at Buffalo Wild Wings (Tr. at 59-60).

When asked about the difficulties he encountered with previous jobs, Plaintiff stated he became mad when his supervisor would "cuss" at him after missing days due to illness (Tr. at 60). At the time of the hearing, Plaintiff was not experiencing any negative side effects from his medication (Tr. at 61). To the contrary, he thought the Depakote was helping his mood (Tr. at 62).

24

He could not remember the last time he had a seizure (Tr. at 62). Plaintiff sleeps well at night; if he has trouble falling asleep, he finds it helpful to turn on music (Tr. at 64). He typically gets six to eight hours of sleep a night (Tr. at 65).

Plaintiff testified his mother went with him to all of his doctor's appointments (Tr. at 61). His girlfriend usually accompanied him on the bus (Tr. at 61). Although his mother or father usually took him to the store, he was able to shop on his own (Tr. at 63). Plaintiff was able to pay for the items he purchased, but had difficulty knowing how much to pay and what his change should be (Tr. at 63).

Plaintiff does not have any problem reading and reads the newspaper on a regular basis (Tr. at 63). He is able to understand what the article is generally about even though he may not understand some of the words (Tr. at 63-64). At home, Plaintiff's chores include mowing the lawn and walking the dogs (Tr. at 65). His mother usually reminds him to complete these chores (Tr. at 65-66).

### 3.   Vocational expert testimony

Vocational expert, George Horne, testified at the request of the ALJ (Tr. at 66-72). Mr. Horne testified he was concerned whether Plaintiff had any past relevant work; work that was performed could be classified as unskilled (Tr. at 67). The ALJ first asked Mr. Horne to assume a hypothetical person who was 19 years old with a high school education and no past relevant work (Tr. at 68). Such an individual had: (1) borderline intellectual functioning; (2) a history of ADHD; (3) a bipolar mood, by report; (4) a learning disorder, not otherwise specified; and (5) a history of seizure disorder (Tr. at 68). There were no physical limitations on work (Tr. at 68). However, due to the history of seizure disorder, the ALJ told Mr. Horne to assume such an individual needed to

Case 6:06-cv-03235-REL   Document 16   Filed 04/03/07   Page 25 of 36

avoid exposure to climbing or significant unprotected heights, potentially dangerous and/or unguarded moving machinery and commercial driving (Tr. at 68). Because of such individual's learning disorder, use of the written word would be limited to simple, rote words that are easily recognized and used solely with checkmarks or signature; likewise, math would not be used on the job (Tr. at 68). Given these impairments, Mr. Horne was asked to assume the need for simple repetitive work (utilizing one, two or three steps), no contact with the public, no more than minimal contact with coworkers, minimal use of independent judgment, and little need to experience change (Tr. at 68). Mr. Horne stated that such an individual could perform medium unskilled work such as a laundry worker, with 1,000 positions in Missouri and over 48,000 nationally, and as a furniture cleaner, with over 9,000 positions in Missouri and over 390,000 in the national economy (Tr. at 69).

When asked by Plaintiff's attorney to consider the limitations indicated by Dr. Baluyot in her Medical Source Statement - Mental, Mr. Horne opined that they would preclude all competitive employment (Tr. at 70). He further stated that a marked limitation on maintaining attention and concentration for extended periods and completing a normal workday and workweek without interruptions would preclude competitive employment (Tr. at 71). The marked limitation on adaptive functioning (i.e., being able to accept constructive criticism and being able to get along with coworkers) compounded the situation further and would preclude unskilled work (Tr. at 71-72). Finally, a limitation on the ability to travel in unfamiliar places, to use public transportation, set realistic goals, and make plans independently of others indicated the need for closer supervision than would be available in competitive employment (Tr. at 72). Because breakdowns within these separate categories would, alone, preclude competitive work in the national economy, Mr. Horne testified they would also do so when taken in combination (Tr. at 72).

### D. FINDINGS OF THE ALJ

On November 14, 2005, the ALJ issued an opinion finding that Plaintiff was not disabled at step five of the sequential analysis. The ALJ found at step one that Plaintiff had never engaged in substantial gainful activity (Tr. at 16, 21). At step two, she found Plaintiff had a number of severe impairments including: borderline intellectual functioning; learning disorder, not otherwise specified; a history of attention deficit hyperactivity disorder; bipolar mood disorder, by report; and a history of seizure disorder (Tr. at 16, 21). She found at step three that the impairments did not meet or equal the severity of "the clinical criteria of an impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1" (Tr. at 16, 21). The ALJ next found that since Plaintiff "has never engaged in substantial gainful activity, he has no past work experience that is vocationally relevant" (Tr. at 20, 21-22). However, at step five, the ALJ found there were a significant number of jobs in the regional and national economy that Plaintiff could perform (Tr. at 20, 22).

### V. RESIDUAL FUNCTIONAL CAPACITY and WEIGHT GIVEN TO TREATING PHYSICIAN'S OPINION

Plaintiff's argument concerning the ALJ's residual functional capacity determination is two-fold. Plaintiff first argues the ALJ erred in disregarding Dr. Baluyot's findings as contained in the Medical Source Statement - Mental. He then argues that the ALJ's lack of reliance on these findings caused the residual functional capacity to be erroneous. I disagree.

Plaintiff is correct that the opinions of a treating physician are generally entitled to substantial weight; however, such entitlement is not unqualified. "[A] treating physician's opinion regarding an applicant's impairment will be granted 'controlling weight,' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

27

inconsistent with the other substantial evidence in [the] record.'" Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000)(emphasis added)(quoting 20 C.F.R. § 404.1527(d)(2)). Even though a treating physician's opinion is "normally entitled to great weight," it "do[es] not automatically control, since the record must be evaluated as a whole." Id. (quoting Rankin v. Apfel, 195 F.3d 427, 430 (8th Cir. 1999); Bentley v. Shalala, 52 F.3d 784, 785-86 (8th Cir. 1995)). When a treating physician's notes are inconsistent with subsequent opinions, the court need not give controlling weight to such opinions. See Pirtle v. Astrue, No. 06-2363, 2007 WL 763818, at * 2 (8th Cir. Mar. 15, 2007)(citing Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006)); Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001)(concluding ALJ "did not err in discounting the inconsistent and unsupported portions of [the] medical source statement).

In this case, Dr. Baluyot's Medical Source Statement - Mental contained a number of marked limitations (Tr. at 605-607). Specifically, she found Plaintiff was markedly limited in the ability to (1) understand and remember detailed instructions and carry out detailed instructions, (2) carry out detailed instructions, (3) maintain attention and concentration for extended periods, (4) work in coordination with or proximity to others without being distracted by them, (5) complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, (6) ask simple questions or request assistance, (7) accept instructions and respond appropriately to criticism from supervisors, (8) get along with coworkers or peers without distracting them or exhibiting behavioral extremes, (9) respond appropriately to changes in the work setting, (10) travel in unfamiliar places, and (11) set realistic goals or make plans independently of others (Tr. at 605-607). By contrast, her treatment notes did not contain similarly severe limitations. On February 24, 2004, Dr. Baluyot

28

assessed Plaintiff's GAF at 65, a score indicating only mild symptoms (Tr. at 544, 610). Her own notes also indicated mild symptoms, as evidenced by references to Plaintiff eating and sleeping well, being in a stable mood, being able to perform activities of daily living on his own, doing well in school, maintaining good eye contact, smiling, being happy and content, denying anger outbursts, and stating his "behavior problems" were not as bad as before (Tr. at 538, 540, 542, 544, 608, 610, 615, 616, 617, 618, 619, 621, 622). The session where Plaintiff appeared "sad" corresponded to a breakup with his girlfriend and a recent robbery (Tr. at 620). Over the course of Plaintiff's treatment, Dr. Baluyot did not make significant changes to his medication regimen (Tr. at 538, 540, 544-545, 610-611, 616, 617, 618, 619, 620, 621, 622).

Other evidence of record also suggests that Plaintiff's limitations were not as severe as those contained in Dr. Baluyot's Medical Source Statement - Mental. Plaintiff's treating physician, Dr. Ashkenasi, noted he was doing "very well" on his medication (Tr. at 479). Likewise, the non-examining psychologists who reviewed Plaintiff's records opined his limitations were much more moderate, both stating Plaintiff's only "marked" limitation(s) involved understanding and/or carrying out detailed instructions (Tr. at 522-569, 575-592). Plaintiff's former teacher and BASE Program supervisor believed he could do well in a job setting (Tr. at 419, 429, 430). As a result, the ALJ did not err in discounting Dr. Baluyot's Medical Source Statement and, in turn, determining Plaintiff's residual functional capacity. Plaintiff's motion for summary judgment is denied on this basis.

## VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that Plaintiff's testimony was not credible.

### A. CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to

Case 6:06-cv-03235-REL   Document 16   Filed 04/03/07   Page 29 of 36

decide, not the courts.  Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints.  McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions.  Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).  If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole.  Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit Plaintiff's position that he is completely unable to work to be supported by substantial evidence.  Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ.  In determining credibility, consideration must be given to all relevant factors, including a plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions.  Polaski, 739 F.2d at 1322.

The specific reasons for discrediting Plaintiff's subjective complaints are as follows:

1.     **PRIOR WORK RECORD**

In both his January 16, 2003, and January 14, 2004, individualized education program reports, Plaintiff stated he was "able to do all work that [was] required on the job" (Tr. at 396, 381).  He also reported in the 2003 report that he hoped to find a paying job and had applied at Dominos Pizza (Tr. at 396).  Plaintiff's teacher noted he did well in the BASE Program and that Plaintiff's

30

supervisors had "great things to say about his job performance" (Tr. at 396, 381). The 2004 report stated Plaintiff had been hired as a dishwasher from 4:00 until 8:15 daily (Tr. at 381).

On January 6, 2004, Plaintiff's teacher again stated he did well in the BASE Program, especially in the janitorial area (Tr. at 366). She described Plaintiff as being fairly easy to get along with and that he could handle criticism fairly well without getting too upset (Tr. at 366). On March 30, 2004, Plaintiff's supervisor in the BASE Program's custodial department reported he had been hired as a part-time, paid employee (Tr. at 429). Although he described Plaintiff as "immature and somewhat moody," he stated Plaintiff did not have any problem with simple repetitive tasks and believed he could work forty hours a week "with a little patience" (Tr. at 430). The comment regarding patience related to Plaintiff's occasional immature behavior and need for occasional reminders if given out-of-the-ordinary tasks (Tr. at 430). On January 24, 2004, Plaintiff's teacher said believed Plaintiff could do well on the job if the right job were found and stated he followed directions well when he understood what he was being asked to do (Tr. at 419). Plaintiff had two part-time jobs on March 23, 2004, and enjoyed them both (Tr. at 540, 622).

Even despite her restrictive Medical Source Statement - Medical, Dr. Baluyot opined on June 17, 2005, that Plaintiff could perform part-time work if supervised (Tr. at 607). Dr. Sutton stated Plaintiff seemed to have the residual skills needed to complete a workweek, his mood disorder appeared to be controlled with medication, and his cognitive function should allow for simple to moderately complex work (Tr. at 587).

At the hearing, Plaintiff's mother testified he was currently collecting unemployment and looking for a job (Tr. at 55). Plaintiff also testified he had an application pending for a full-time position (Tr. at 57).

This evidence demonstrates Plaintiff was able to, and in fact had, successfully performed appropriate work in the past. The fact that Plaintiff is actively looking and applying for jobs indicates he does not believe his impairments render him completely unable to work. This factor supports the ALJ's credibility determination.

## 2. DAILY ACTIVITIES

In both his January 16, 2003, and January 14, 2004, individualized education program reports, Plaintiff stated he vacuumed, took care of the pets, sometimes did laundry and was able to cook a few things at home (Tr. at 396, 381). Plaintiff's mother reported he cared for the family's cats, changed the litter box, could make a bed and change the sheets with help, vacuum, take out the trash, and mow the lawn with supervision (Tr. at 368, 369). Plaintiff's April 21, 2004, Disability Report also stated was able to walk the dogs, make his bed and change his sheets and mow the lawn; he reported being unable to do laundry, do the dishes, iron, vacuum, take out the trash, rake leaves, garden, bank or go to the post office (Tr. at 448-449). On May 12, 2005, Plaintiff reported working at a job where he swept floors and emptied trash cans (Tr. at 471). He stated he could mow the grass, make sandwiches and vacuum (Tr. at 471).

Plaintiff's hobbies included video games, catching a football and going to church events (Tr. at 370, 450). The records indicate Plaintiff was able to make and keep friends, and even had a girlfriend (Tr. at 59-60, 415, 455, 546, 612). He was doing well academically (Tr. at 373-374, 377-378).

On February 24, 2004, Dr. Baluyot noted Plaintiff could perform activities of daily living on his own (Tr. at 544, 610). Likewise, Dr. Burstin reported Plaintiff had only moderate limitations in his activities of daily living (Tr. at 562). Dr. Sutton opined Plaintiff had mild limitations in his

activities of daily living (Tr. at 585).

At the hearing, Plaintiff testified he took the bus to a job interview and independently made multiple transfers without difficulty (Tr. at 57-58). His chores at home included mowing the lawn and walking the dogs (Tr. at 65).

These facts suggest Plaintiff is able to engage basic activities of daily living. He can use public transportation independently, including when such use requires making transfers. Plaintiff is also able to successfully maintain interpersonal relationships. The ALJ did not err in using this factor to discredit Plaintiff's position.

**3. DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS**

In his January 16, 2003, individualized education program report, Plaintiff stated "I used to have some trouble at school, but I don't have problems with that anymore." (Tr. at 396). On January 19, 2004, Plaintiff's mother told Dr. Fain-Leslie that he seemed to have stabilized (Tr. at 546, 612). On February 24, 2004, Plaintiff stated his "behavior problems" were not as bad as before (Tr. at 542, 608). He denied anger outbursts on March 23, 2004 (Tr. at 540, 622). These statements, as well as my own review of Plaintiff's records in their entirety, reveal that Plaintiff's symptoms improved as he got older and was appropriately medicated. As a result, I find this factor supports the ALJ's finding that Plaintiff was not completely unable to work.

**4. PRECIPITATING AND AGGRAVATING FACTORS**

Plaintiff's mother reported anything that required concentration caused Plaintiff to have mood swings (Tr. at 368). Plaintiff's April 21, 2004, Disability report stated he had difficulty working with large groups of people and was unable to do stressful jobs (Tr. at 444, 447). Jobs with more than one step aggravated Plaintiff's symptoms (Tr. at 447). He also became irritable if there

were noises when he was trying to concentrate (Tr. at 544, 546, 610, 612). This factor weighs against the ALJ's determination.

5.    DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION

On June 30, 2003, Dr. Ashkenasi reported Plaintiff was doing "very well" on Depakote and Nortriptyline (Tr. at 480). He also made this comment on December 29, 2003, and continued Plaintiff on the same medication regimen (Tr. at 479). Over the course of Dr. Baluyot's treatment of Plaintiff, she left his medication regimen largely unchanged (Tr. at 538-544, 610-622).

Plaintiff's January 10, 2005, record from his visit to Dr. Baluyot stated the Depakote caused abdominal pain (Tr. at 617). At the hearing, however, Plaintiff testified he was not experiencing any negative side effects from his medication and thought the Depakote was helping his mood (Tr. at 62). This factor supports the ALJ's finding.

6.    FUNCTIONAL RESTRICTIONS

The record does not reveal that Plaintiff's doctors ever placed him on any restrictions.

### B.  CREDIBILITY CONCLUSION

For all the reasons discussed above, I find that the record contains substantial evidence supporting the ALJ's finding that Plaintiff's allegations of a complete inability to work are not credible. Plaintiff's motion for summary judgment on this basis is, therefore, denied.

### VII.  HYPOTHETICAL QUESTIONS

Plaintiff contends that the hypothetical questions posed to the vocational expert did not adequately reflect his impairments as evidenced by the record. A hypothetical question is proper if it "sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ." Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001). "The hypothetical question must

34

capture the concrete consequences of the claimant's deficiencies." Id. However, "the ALJ may exclude any alleged impairment that she has properly rejected as untrue or unsubstantiated." Id.

Here, the ALJ found Plaintiff's severe impairments included:

> Borderline intellectual function; learning disability, not otherwise specified; history of attention deficit hyperactivity disorder; bipolar mood disorder by report; and history of seizure disorder. His mental impairments result in moderate restriction of activities of daily living, moderate limitation of social functioning and moderate limitation of ability to maintain concentration, persistence or pace (but slight limitation of the ability to maintain concentration, persistence and pace on simple tasks) and have resulted in no episodes of decompensation.

(Tr. at 21). She also determined Plaintiff's residual functional capacity to be as follows:

> He has no exertional limitations. He is unable to perform work involving exposure to significant unprotected heights or potentially dangerous, unguarded moving machinery. He is unable to perform commercial driving. He is limited to work that is simple and repetitive in nature (i.e., involving only one-, two- or three-step instructions). He is limited to work involving no contact with the pubic and minimal contact with co-workers. He is limited to work involving minimal use of independent judgment and minimal need to experience change in the work setting. He is limited to work involving simple, rote words and no mathematics.

(Tr. at 21).

The hypothetical questions posed to Mr. Horne encompassed each of these limitations (Tr. at 67-68). As discussed above, the ALJ properly determined Plaintiff's residual functional capacity and discounted Plaintiff's position that he was completely unable to work. The ALJ thus was justified in omitting Dr. Baluyot's limitations and Plaintiff's subjective complaints from her questions. Plaintiff's motion is denied on this ground.

## VIII. CONCLUSION

Therefore, it is

ORDERED that Plaintiff's motion for summary judgment is denied. It is further

Case 6:06-cv-03235-REL   Document 16   Filed 04/03/07   Page 35 of 36

ORDERED that the decision of the Commissioner is affirmed.


                                    _/s/ Robert E. Larsen_____
                                    ROBERT E. LARSEN
                                    United States Magistrate Judge

Kansas City, Missouri
April 2, 2007_____